IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOSE RICARDO VILLALTA CANALES, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-19-3383 |
| JOSEPH CAW, *et al.*, | * | |
| Defendants. | * | |

************

## MEMORANDUM OPINION

THIS MATTER concerns a suit by José Ricardo Villalta Canales ("Plaintiff"), related to his detention and arrest in August, 2019. Plaintiff has sued the State of Maryland, the Maryland Department of Natural Resources ("DNR"), the Maryland Department of Natural Resources Police ("DNR Police"), and three individual DNR police officers (collectively, "Defendants"). ECF 1. Defendants filed a Motion to Dismiss, ECF 24, Plaintiff filed an opposition, ECF 31, and Defendants filed a Reply, ECF 33. The Motion to Dismiss is now ripe for adjudication, and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons explained below, Defendants' Motion will be DENIED.

I. **FACTUAL BACKGROUND**

Plaintiff came to the United States from El Salvador, as an unaccompanied minor, more than thirteen years ago. ECF 1 ¶ 21.[1] As of August, 2019, Plaintiff lived with his aunt in Montgomery County, Maryland. *Id.* ¶ 22. He has numerous other family members in the Montgomery County area, including his uncle, who lives in Rockville, Maryland. *Id.* ¶ 23. At some

---

[1] The facts are derived from Plaintiff's Complaint at ECF 1.

time during the past few years, Plaintiff missed a hearing related to his immigration status. *Id.* ¶ 22.

On July 10, 2019, the Montgomery County Department of Housing and Community Affairs sent Plaintiff's uncle a notice regarding two violations of the Montgomery County Code. *Id.* ¶ 23. The violations concerned Plaintiff's uncle's property, and required him to remove dead tree limbs (or the entire tree) within thirty days of the notice. *Id.* Accordingly, Plaintiff, and his cousin ("Mauricio"), went to the uncle's property on August 6, 2019, to assist in disposing of the tree limbs. *Id.* ¶ 25.

After nine hours of work on August 6, 2019, Plaintiff and Mauricio returned the following day, resuming work at approximately 9:15 AM. *Id.* ¶ 26. At around 9:56 AM, DNR Police dispatch received a complaint about someone "operating an unlicensed tree expert business" at the uncle's Rockville property. *Id.* ¶ 27. Officers Michael Sullivan, Lakeram Chhaturam, and Joseph Caw (collectively, "DNR Officers") arrived at the property at approximately 10:40 AM. *Id.* ¶ 28. The officers were in full uniform, which included firearms, handcuffs, tasers, and bulletproof vests. *Id.* ¶ 29.

Upon the DNR Officers' arrival, Officer Michael Sullivan ("Officer Sullivan") asked Mauricio whether he was in charge of cutting down the tree. *Id.* ¶ 31. Mauricio stated that Plaintiff was in charge, but he also explained that Plaintiff did not speak English. *Id.* Mauricio then started to serve as an intermediary, translating for Plaintiff and the DNR Officers. For instance, Plaintiff confirmed through Mauricio that Plaintiff did not speak English. *Id.* Even so, since Mauricio speaks English as a second language, and is not a trained interpreter, he was uncomfortable communicating with the DNR Officers in English. *Id.* ¶ 39 (explaining that Mauricio struggled with the *ad hoc* translation, but did his best, given the circumstances).

The DNR Officers ordered Plaintiff, who was working up in the tree, to come down to the ground. *Id.* ¶ 32. Since the instruction was given in English, Mauricio told Plaintiff to come down, in Spanish. *Id.* Once Plaintiff came down, the DNR Officers asked Plaintiff whether he had insurance or a license to cut trees. *Id.* ¶ 34. Through Mauricio, Plaintiff replied that he had neither a license nor insurance. *Id.* ¶ 35.

Maryland Natural Resources Law 5-417(a)(1) requires anyone engaging in the business of a tree expert to be licensed. Md. Code Ann., Nat. Res. § 5-417. Because Plaintiff failed to procure a tree expert license before assisting his uncle, the DNR Officers believed that Plaintiff had violated the statute. *See* ECF 1 ¶ 36. However, since this incident would be Plaintiff's first violation of the statute, the DNR Officers' statutory authority was limited to issuing a citation for a monetary fine. *Id.* ¶ 37.

The DNR Officers informed Plaintiff that he had violated state law, and asked for his driver's license. *Id.* ¶ 43. Plaintiff provided a driver's license, which was marked with the notation "NOT FOR FEDERAL IDENTIFICATION." *Id.* ¶ 44. Next, the DNR Officers "ordered [Plaintiff] not to climb up the tree again and instructed [him] and Mauricio to continue working around the bottom of the tree and stay around there while they prepared the citation." *Id.* ¶ 45. As two Officers crossed the street to their police vehicles, Officer Lakeram Chhaturam ("Officer Chhaturam") reiterated that Plaintiff and Mauricio needed to remain near the tree. *Id.* ¶ 47. Plaintiff obeyed the Officers' command, and awaited the return of his driver's license (and citation) in the designated area. *Id.* ¶ 48.

At their police vehicles, the DNR Officers contacted DNR Police dispatch, in order to (1) confirm Plaintiff's lack of a tree expert license and (2) search for any outstanding warrants in his name. *Id.* ¶ 49. While dispatch confirmed that Plaintiff did not have a license, and did not have

3

outstanding criminal warrants, dispatch also made the Officers aware of a civil administrative warrant, related to the immigration status of a person with Plaintiff's name. *Id.* ¶ 50. The civil administrative warrant listed an Immigration and Customs Enforcement ("ICE") telephone number, for officers to call if they have contact with Plaintiff. *Id.* ¶ 51.

At around 11:30 AM, Officer Sullivan called the phone number, and requested that ICE respond to the scene. *Id.* ¶ 52. As a result of Officer Sullivan's call, ICE began to investigate whether Plaintiff was the subject of the ICE warrant. *Id.* ¶ 54. Contemporaneously with the conversations between the DNR Officers and ICE, Plaintiff became increasingly concerned with how long the Officers were taking, but he felt that his only option was to continue waiting, particularly because the Officers had his driver's license in their possession. *Id.* ¶ 55.

Ultimately, an ICE official telephoned Officer Sullivan to confirm that Plaintiff had an open civil immigration warrant, and to let him know that an ICE agent "was en route to their location." *Id.* ¶ 61. Around the same time, the DNR Officers instructed Plaintiff to cross the street in order to sign the citation. *Id.* ¶ 62. Mauricio relayed the instruction, in Spanish, to Plaintiff. *Id.* The DNR Officers spoke to Plaintiff alone about his citation, and did not offer to provide a translation of the document. *Id.* ¶ 64. Due to Plaintiff's lack of comprehension, Officer Chhaturam asked Mauricio to cross the street, and to assist in translating from English to Spanish. *See id.* ¶ 65. Mauricio attempted to explain part of the document to Plaintiff, in a rushed fashion, and Plaintiff signed the citation. *See id.* ¶ 66. Immediately after the signing, the DNR Officers handcuffed Plaintiff, and told him that he was under arrest because he was the subject of an ICE warrant. *Id.* ¶ 68.

The DNR Officers kept Plaintiff handcuffed near their police vehicles from 11:40 AM until 12:45 PM, when they placed Plaintiff inside a police vehicle. *Id.* ¶ 71–72. Shortly thereafter, ICE

agents arrived on the scene. *Id.* ¶ 72. The ICE agents physically removed Plaintiff from the police vehicle, and threatened to tase him. *Id.* ¶ 73. The DNR Officers gave Plaintiff's driver's license to his family members, many of whom had arrived during this incident. *Id.* ¶ 75, 69. Plaintiff has remained in ICE detention since the date of this incident. *Id.* ¶ 77.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not

countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). However, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

## III. ANALYSIS

Plaintiff has brought three causes of action pursuant to 42 U.S.C. § 1983, and a fourth cause of action pursuant to 42 U.S.C. § 2000d. Since Defendants have moved to dismiss on three separate bases, each is addressed in turn.

### A. Fourth Amendment

### 1. Whether Plaintiff was "seized" within the meaning of the Fourth Amendment

Defendants have mounted several arguments that are specific to Plaintiff's rights under the Fourth and Fourteenth Amendments. First, Defendants contend that Plaintiff's rights did not attach, during the incident of August 7, 2019, because Plaintiff was never "seized" by the DNR Officers. *See* ECF 24-2 at 8–9.

The Fourth Amendment secures an individual's right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. "Because 'not every encounter between a police officer and a citizen is an intrusion requiring an objective justification,' *United States v. Mendenhall*, 446 U.S. 544, 533 (1980), we must first decide if and when the individual was 'seized' for purposes of the Fourth Amendment, *United States v. Wilson*, 953 F.2d 116, 120 (4th Cir. 1991)." *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 460 (4th Cir. 2013). The Supreme Court has identified three primary categories of police-citizen encounters: (1) consensual encounters, (2) investigative *Terry* stops, and (3) arrests. *Santos*, 725 F.3d at 460. Because the encounters in these categories constitute varying levels of intrusion by police officers, each category requires a different level of justification from law enforcement.

A police-citizen encounter rises to the level of a Fourth Amendment "seizure" when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Id.* (quoting *Jones*, 678 F.3d at 299). The court's inquiry is objective, and should consider whether "in view of all of the circumstances surrounding the incident, a reasonable person

would have believed that he was not free to leave." *Id.* (quoting *Jones*, 678 F.3d at 299). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has identified several factors that courts should consider in determining whether a police-citizen encounter constitutes a seizure, including:

> The number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of illegal activity rather than treating the encounter as routine in nature.

*Id.* at 461.

In *Santos*, Frederick County police officers confronted Ms. Santos, a native of El Salvador, as she sat on a curb, near her job at a market food co-op. *Id.* at 457. Although the officers were conducting a routine patrol of the area, their Sheriff's Office had reached an agreement with ICE to assist in immigration enforcement efforts. *Id.* After asking Ms. Santos several general questions about her reason for being in that area, the officers asked for her identification card. *Id.* The officers ran a warrant check on Ms. Santos with radio dispatch, and soon learned that she had an outstanding ICE warrant, which required "immediate deportation." *Id.* at 458. At some point during the encounter, Ms. Santos asked if there was a problem, and the officers gestured for her to remain seated on the curb. *Id.* Ultimately, the officers not only placed Ms. Santos in handcuffs, but also transported her to a detention center, where she was transferred to ICE custody. *Id.* When Ms. Santos filed a suit under § 1983, the defendants moved to dismiss, partially on the grounds that most of the encounter was "consensual," and thus, did not constitute a Fourth Amendment "seizure." *Id.* at 461.

On appeal, the Fourth Circuit agreed with the defendants that the "inception" of the encounter was consensual. Nonetheless, the consensual encounter "became a Fourth Amendment

seizure when [an officer] gestured for Santos to remain seated." *Id.* at 462. According to the panel, the officer's "unambiguous" gesture "would have communicated to a reasonable person that she was not at liberty to rise and leave." *Id.*

Here, similarly, the encounter started out as consensual when the DNR Officers were posing basic questions to Plaintiff. *See* ECF 1 ¶ 34 ("The DNR Police Officers then elicited information from Mr. Villalta about whether he and Mauricio owned the house…"). However, subsequent events confirm that the encounter evolved into a seizure within the meaning of the Fourth Amendment. Primarily, after a series of questions, the DNR Officers ordered Plaintiff not to climb up the tree, and instructed him to "stay around" the bottom of the tree. *Id.* ¶ 45. Even if the Officers' initial command was not as "unambiguous" as the directive in *Santos*, Officer Chhaturam's later reiteration of the same instruction demonstrated that Plaintiff was not free to leave the immediate vicinity. *See id.* ¶ 47. Moreover, the DNR Officers not only ordered Plaintiff to remain in a specified area, but also took his driver's license as they prepared the citation. Indeed, holding on to Plaintiff's license was more intrusive than taking the identification card in *Santos* because, unlike Ms. Santos, Plaintiff could not lawfully drive away from the property without his driver's license. Accordingly, Plaintiff was seized within the meaning of the Fourth Amendment.

**2. Whether the detention was unreasonable**

Next, Defendants contend that, even if Plaintiff was seized, the detention was reasonable. ECF 24-2 at 8–12. As noted above, the Fourth Amendment protects against "unreasonable" searches and seizures. As an initial matter, in their briefing, Defendants suggest that the overall encounter should be broken up into three smaller periods of time. *See, e.g.*, *Id.* at 11 ("The complaint alleges that this second period of detention lasted only about 10 minutes"). The Complaint does not divide the encounter in such a manner. Thus, at the Motion to Dismiss stage,

the Court must reject Defendants' characterization of the incident. *See Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 670 (D. S.C. 2016) ("Any attempt by the moving party to assert its own version of events should be disregarded, as facts alleged in a plaintiff's complaint are all accepted as true at this stage in the case.") (citing *Zak v. Chelsea Therapeutics Int'l*, 780 F.3d 597, 601 (4th Cir. 2015)).

Defendants argue, primarily, that Plaintiff's detention was justified, because he violated Maryland Natural Resources Law. *See* ECF 24-2 at 3 (noting that Md. Code Ann., Nat. Res. §§ 5-415(c) requires that any person cutting down a tree that is more than 20 feet tall must have a tree expert license). Plaintiff concedes that he did not have the necessary license, and thus, that the DNR Officers had the legal authority to issue a citation. ECF 1 ¶ 36–37. Even so, case law makes clear that police officers can violate an individual's rights by unreasonably *prolonging* a detention. *See, e.g.*, *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015). In particular, officers may not prolong a detention solely for the purpose of investigating a civil immigration matter. *See generally Artiga Carrero v. Farrelly*, 270 F. Supp. 3d 851 (D. Md. 2017).

In *Artiga Carrero*, Mirna Artiga Carrero sued various state and federal officials, for their conduct in what she asserted was an unlawful arrest in 2014. *Id.* at 857–58. In 2014, Ms. Artiga Carrero had a civil warrant for removal associated with her name, resulting from a failure to appear before an immigration judge approximately eight years earlier. *Id.* at 858. In August, 2014, as she was driving home after work, a Baltimore County police officer stopped her. *Id.* at 859. The officer informed Ms. Artiga Carrero that he stopped her because she did not have valid insurance. *Id.* However, while checking a database at his police cruiser, the officer learned about her outstanding civil warrant. *Id.* The officer, accordingly, placed her under arrest, and contacted an ICE agent. *Id.* Ms. Artiga Carrero was transferred into ICE custody shortly thereafter. *Id.*

Relevant here, the Court found that Ms. Artiga Carrero stated a plausible claim that the police officer unreasonably prolonged the duration of the stop. Specifically, the officer prolonged her detention "solely to investigate her immigration status—an issue 'completely unrelated to the event that provided the justification for the stop in the first place.'" *Id.* at 870 (quoting *United States v. Digiovanni*, 650 F.3d 498, 511 (4th Cir. 2011)). Thus, the detention was not "sufficiently limited in scope and duration" to satisfy the Fourth Amendment. *Id.*

In reaching its decision, the Court relied considerably upon *Santos*, 725 F.3d 451 (4th Cir. 2013). As noted above, *Santos* found, under similar circumstances as presented here, that the plaintiff was seized within the meaning of the Fourth Amendment. Additionally, however, the Court's broader holding is instructive for this matter. The panel concluded that,

> [A]bsent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law.

*Id.* at 465.

Therefore, the defendants violated Ms. Santos's rights when they seized her — without any authorization from a federal official — solely on the basis of her outstanding civil ICE warrant. *See id.* In *Artiga Carrero*, the Court applied *Santos*, determining that a plaintiff's Fourth Amendment rights are violated when officers *prolong* a detention based solely on an outstanding civil immigration warrant. *See* 270 F. Supp. 3d at 873.

Together, *Santos* and *Artiga Carrero* demonstrate that, in this case, Plaintiff has plausibly alleged a violation of his Fourth Amendment rights. Plaintiff alleges that Defendants detained him "well beyond the time necessary to effectuate the purpose of the detention." ECF 1 ¶ 99. Whereas the prolonged detention in *Artiga Carrero* was unrelated to investigating Ms. Artiga Carrero's insurance, here, Plaintiff alleges that the prolonged detention was unrelated to his violation of Maryland Natural Resources Law. In fact, the traffic stop in *Artiga Carrero* "lasted in excess of

11

twenty minutes," 270 F. Supp. 3d at 870, while the encounter between Plaintiff and the DNR Officers took more than two hours. Plaintiff has made a plausible case that Defendants violated his Fourth Amendment rights, by prolonging the stop solely to investigate Plaintiff's civil immigration warrant.

### 3. Whether the DNR Officers operated under color of federal law

Finally, Defendants contend that their actions are immune from potential § 1983 liability, because the latter portion of Plaintiff's detention was effectuated under color of federal law, not state law. ECF 24-2 at 13–15. Certainly, federal law provides that state and local law enforcement, when assisting in federal immigration enforcement, are "subject to the direction and supervision of the Attorney General [of the United States]." 8 U.S.C. § 1357(g)(3). However, in *Artiga Carrero*, the Court rejected the same argument by the state defendants in that case. Based on Ms. Artiga Carrero's complaint, she plausibly alleged that the officer acted before receiving any direction from federal authorities, and, in particular, "unilaterally determined to prolong his detention of her after discovering the outstanding civil warrant of removal." 270 F. Supp. 3d 851 at 873 n.7.

Here, similarly, Plaintiff has plausibly alleged that the DNR Officers deviated from the initial justification for the stop, *i.e.*, citing Plaintiff for a violation of Maryland Natural Resources Law, because of his civil immigration warrant. Although Defendants contend that federal officials provided authorization for detaining Plaintiff, their argument is not based on facts that Plaintiff alleged in the Complaint. The Complaint states that DNR Police did not have any agreement with ICE to assist in federal immigration enforcement efforts, ECF 1 ¶ 19, and, furthermore, the Complaint is devoid of any assertion that ICE, or any other federal officials, *ever* directed the DNR Officers to detain Plaintiff. *See* ECF 1 ¶ 61 (stating that an ICE agent said he was "en route to their

location"). Accordingly, the "facts *currently before the Court* preclude a finding that [Defendants were] acting under color of federal law" during the events of August 7, 2019.[2] *See Artiga Carrero,* 270 F. Supp. 3d 851 at 873 n.7 (emphasis in original).

### B. Qualified Immunity

Importantly, "even if a seizure runs afoul of the Fourth Amendment, a plaintiff may not be able to obtain relief if the defendant is entitled to qualified immunity." *Santos*, 725 F.3d at 460 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine of qualified immunity "balances two important interests, namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform duties responsibility from harassment, distraction, and liability." *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019) (citation omitted). The burden of establishing the qualified immunity defense rests on the party seeking to invoke it. *Id.* Determining whether the DNR Officers are entitled to the qualified immunity defense requires the Court to conduct two related inquiries: (1) consider whether the facts alleged, taken in the light most favorable to Plaintiff, establish that the Officers' conduct violated Plaintiff's Fourth Amendment rights, and (2) assess whether this right was clearly established as of August 7, 2019, *i.e.*, the date of the incident. *See id.*

As noted above, it is settled law in this circuit that officers cannot, lawfully, initiate or prolong a detention solely based on suspected violation of civil immigration law. Plaintiff has plausibly alleged that the DNR Officers detained Plaintiff for more than an hour, because of the civil immigration warrant associated with his name. Taking the allegations in the Complaint as true, the officers not only acted without the required directive from a federal official, but also

---

[2] The *Artiga Carrero* Court noted that "discovery may reveal that Officer Farrelly in fact received direction from ICE before the duration of the stop became unreasonable." 270 F. Supp. 3d 851 at 873 n.7. Likewise, here, Defendants may be able to show that ICE directed the DNR Officers to detain Plaintiff. Thus, Defendants are free to raise this argument again at the appropriate time.

13

detained Plaintiff for a much longer period of time than was necessary to issue a citation for violation of the Maryland statute. Accordingly, Plaintiff has sufficiently alleged that the DNR Officers violated his Fourth Amendment rights. *See DiMeglio v. Haines*, 45 F.3d 790, 798 (4th Cir. 1995) ("[A] court reviewing a qualified immunity defense should assess … whether the *alleged conduct* violated law clearly established at the time the conduct occurred.") (emphasis added).

Furthermore, these rights were clearly established at the time of the DNR Officers' conduct, since *Santos* and *Artiga Carrero* were decided several years prior to this incident. Indeed, the Court explained that *Santos* was clearly established law at the time of the *Artiga Carrero* decision. *See* 270 F. Supp. 3d 851 at 872–73. At this point in the proceedings, the DNR Officers have not met their burden to establish the applicability of the qualified immunity defense.[3]

### C. Governmental Defendants

In the fourth cause of action, Plaintiff alleges a violation of Title VI, by the State of Maryland, DNR, and DNR Police (collectively, "Governmental Defendants"). ECF 1 at 19. Specifically, Plaintiff contends that the Governmental Defendants failed to adhere to a Maryland civil rights law, known as "Equal Access to Public Services for Individuals with Limited English Proficiency." *See id.* ¶ 113.

Defendants contend that, to allege a private right of action under Title VI, a plaintiff must allege "intentional discrimination" in "federally financed programs." *Peter v. Jenney*, 327 F.3d 307, 315 (4th Cir. 2003). Despite Defendants' arguments to the contrary, the Complaint plausibly

---

[3] Defendants are welcome to raise the qualified immunity defense at the Summary Judgment stage. As explained previously, Defendants may show, for example, that they were acting at the behest of the ICE officials. *See Tobey v. Jones*, 706 F.3d 379, 393–94 (4th Cir. 2013) (explaining that a defendant can raise the qualified immunity defense both on a motion to dismiss and a motion for summary judgment).

alleges that the Governmental Defendants receive federal financing, and that Plaintiff was intentionally discriminated against. *See* ECF 1 ¶ 15 ("Defendant State of Maryland is a public entity that receives federal funds and, accordingly, is subject to Title VI of the Civil Rights Act of 1964"). Plaintiff was not required, in his Complaint, to provide a comprehensive breakdown of the funding structure for the State of Maryland and its various entities. Even so, at the summary judgment stage, Plaintiff should elaborate on how, if at all, each of the Governmental Defendants is subject to Title VI.

Regarding "intentional discrimination," Defendants argue that they lacked "actual notice" that Plaintiff could not speak English — and required an interpreter — because Mauricio was "effectively translat[ing]" the Officers' orders. *See* ECF 24-2 at 21–22. However, the Complaint makes clear that Mauricio's translations were anything but effective. *See* ECF 1 ¶ 39–40 (stating Mauricio was not comfortable speaking English, and translated "to the best of his abilities"). Moreover, Defendants have not shown that Mauricio's inconsistent, unreliable translations would, under the terms of Maryland's Equal Access law, obviate the need to provide an interpreter. *See* Md. Code. Ann., State Gov't § 10-1101 *et seq.* Taking the allegations in the Complaint as true, as the Court must at this stage, despite having clear notice that Plaintiff was unable to communicate in English, Defendants failed to provide vital translation services.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss, ECF 24, is denied. A separate Order follows.

Dated: April 3, 2020

/s/
Stephanie A. Gallagher
United States District Judge